UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

RAHIEM JONES,

                              Petitioner,

v.                                                              9:18-CV-1348
                                                                (DNH/ML)
BRANDON J. SMITH,

                              Respondent.

_____

APPEARANCES:                                          OF COUNSEL:

RAHIEM JONES
   Petitioner, *Pro Se*
9 Tampa Avenue
Albany, New York 12203

LETITIA A. JAMES                                      JODI A. DANZIG, ESQ.
New York State Attorney General                      Assistant Attorney General
   Counsel for Respondent
28 Liberty Street
New York, New York 10005

MIROSLAV LOVRIC, United States Magistrate Judge

## REPORT-RECOMMENDATION

On November 16, 2018, Rahiem Jones ("Petitioner") filed this Petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254, challenging a judgment of conviction in Albany

County Court, based on his guilty plea of attempted criminal possession of a weapon in the

second degree in 2016.  (Dkt. No. 1, Petition ("Pet." 1-2; *see also People v. Jones*, 156 A.D.3d

960, 960 (N.Y. App. Div. 3rd Dep't 2017).)  In his Petition, Petitioner argues that (1) "[t]he

prosecution withheld requested evidence that could have changed [the] result of [the]

suppression hearing, a *Brady*[1] issue[ resulting in] a 5th and 14th amendment violation" (Dkt. No. 1 at 5-7), (2) the People's withholding of the requested identity of a witness represented malicious prosecution (*id*. at 7-8), and (3) the trial court's credibility determinations based on the suppression hearing were not supported by the weight of the evidence (*id*. at 8-10). For the reasons set forth below, I recommend that the Petition be denied and dismissed.

## I.    BACKGROUND

On June 3, 2015 around 1:30 a.m., in Albany County, in an area known to police as a high drug trafficking area, police officers conducting road patrol observed Petitioner and his acquaintance walking on a sidewalk. (Dkt. No. 15, Attach. 1 at 117-118.) When Petitioner made eye contact with the police vehicle, police observed Petitioner turn around to walk in the opposite direction. (*Id*.) Petitioner was then observed entering a variety store. (*Id*.) Police officers set up surveillance of the store and observed Petitioner make physical contact with an individual that the police officers identified as a known drug dealer. (*Id*. at 118.) Based on their training and experience, police officers believed that the physical contact they observed was a drug transaction. (*Id*.) Police officers went around the block and approached Petitioner who appeared to be acting nervous. (*Id*. at 118-119.) Police officers asked Petitioner if they could pat him down. (*Id*. at 119.) Petitioner agreed and a gun was discovered on Petitioner's person. (*Id*.) Subsequently, Petitioner was arrested. (*Id*.)

---

[1]    *Brady v. United States*, 397 U.S. 742 (1970).

## II. PROCEDURAL HISTORY

### A. New York State Proceedings

#### 1. Indictment, Arraignment, and First Guilty Plea Offer

On June 5, 2015, Petitioner was indicted in Albany County Court[2] and charged with criminal possession of a weapon in the second degree pursuant to New York Penal Law § 265.03(3), a class C violent felony, alleging that on June 3, 2015, at approximately 1:45 a.m., in the area of 126 Bradford Street, Albany, New York, Petitioner possessed a loaded firearm. (Dkt. No. 14, Attach. 1 at 22.) On June 10, 2015, Petitioner was arraigned in Albany County Court. (Dkt. No. 15, Attach. 1 at 1-11.)

On July 1, 2015, Petitioner rejected an offer to plead guilty to attempted criminal possession of a weapon in the second degree pursuant to N.Y. Penal Law §§ 110.00 and 265.03, with a sentence of five years determinate imprisonment, five years of post-release supervision, fees, and waiver of his right to appeal. (*Id*. at 14-15.)

#### 2. Suppression Hearing

On July 24, 2015, Petitioner moved for, *inter alia*, hearings to suppress (1) post-arrest statements that he made to police officers, and (2) the firearm that was found on his person. (Dkt. No. 14, Attach. 1 at 28-30.) A suppression hearing was held on October 8, 2015, during which three police officer witnesses testified for the Government—Matthew Seeber, Daniel Kuhn, and Jason Vogel—and Petitioner testified on his own behalf. (Dkt. No. 15, Attach. 1 at 42-114.)

---

[2]     Indictment No. 20-7462. (Dkt. No. 14, Attach. 1 at 38; Dkt. No. 15, Attach. 1 at 14.)

###### i.    Officers' Testimony

Officer Kuhn testified that on June 3, 2015, he and his partner—Officer Seeber—were traveling south on Quail Street in their patrol vehicle when they observed Petitioner and another individual—Willie Chaney—walking south on Quail Street.  (Dkt. No. 15, Attach. 1 at 53-54.) Officer Kuhn testified that when Petitioner saw their patrol vehicle, he turned around and walked north on Quail, took a few steps, then turned back and continued south toward 122 Quail, which is the location of a store called the Quail Street News.  (*Id*.)  Officer Kuhn testified that he and Officer Seeber set up surveillance to watch the store because it is a known location for drug deals, drug users, and drug dealers.  (*Id*. at 54.)  Officer Kuhn testified that he observed Petitioner and Mr. Chaney enter the store, leave the store a short time later, approach an individual that is a known drug dealer to police officers—Raheim Blanton—complete what appeared to be a hand-to-hand drug transaction, and walk away.  (*Id*. at 54-55.)  Officer Kuhn testified that he and Officer Seeber drove around and located Petitioner and Mr. Chaney in the area of 126 Bradford Street.  (*Id*. at 56.)  Officer Kuhn testified that he and Officer Seeber got out of their vehicle, approached Petitioner and Mr. Chaney, and asked them if they had identification, where they were coming from, and where they were going.  (*Id*.)  Officer Kuhn testified that he observed Petitioner shake and appear nervous.  (*Id*.)  Officer Kuhn testified that, as a result of Petitioner's nervousness and the possible hand-to-hand drug transaction that was observed, he asked Petitioner, "would be okay if I patted you down?" to which Petitioner responded "Yes, sir."  (*Id*. at 56-57.)  Officer Kuhn testified he patted Petitioner down and when he got to the right side of Petitioner's waistband he felt the butt of a handgun.  (*Id*. at 57.) Officer Kuhn testified that he handcuffed Petitioner and then Petitioner stated it was a BB gun.

(*Id*. at 57-58.)  Officer Kuhn testified that when backup arrived, he removed the gun from Petitioner's waistband.  (*Id*.)

Officer Seeber testified that on June 3, 2015, at approximately 1:30 a.m., he was working, riding in a patrol vehicle driven by Officer Kuhn, when he observed Petitioner and Mr. Chaney walking south on Quail Street.  (Dkt. No. 15, Attach. 1 at 81-82.)  Officer Seeber testified that Petitioner had not seen the patrol car but when he did, he stopped, turned around, and went to walk in the other direction but Mr. Chaney put his arm on Petitioner, stopped him, and they continued walking south on Quail Street.  (*Id*. at 82.)  Officer Seeber testified that he and Officer Kuhn set up surveillance around the corner where they observed Petitioner and Mr. Chaney enter 122 Quail Street—the Quail Street Market—come back outside, have a conversation with another male who is a known drug dealer, and engage in a hand-to-hand transaction, then continue walking north on Quail Street and east on Bradford Street.  (*Id.* at 82-83.)  Officer Seeber testified that he and Officer Kuhn went around the block to North Lake, then went west on Bradford Street where they observed Petitioner and Mr. Chaney traveling east.  (*Id*. at 84.)  Officer Seeber testified that he and Officer Kuhn exited the patrol vehicle and interviewed Petitioner and Mr. Chaney, with Officer Kuhn focused on Petitioner and Officer Seeber focused on Mr. Chaney.  (*Id*.)  Officer Seeber testified that he heard Petitioner state "it's a BB gun, it's just a BB gun."  (*Id*.)

Detective Vogel testified at the suppression hearing that he interviewed the Petitioner on June 3, 2015, and that he was not present at the time of Petitioner's arrest.  (*Id*. at 46-50.)

### ii.    Petitioner's Testimony

Petitioner testified on his own behalf at the suppression hearing that on June 3, 2015 at 1:30 a.m., he was walking to the Quail Street Market with Mr. Chaney.  (Dkt. No. 15, Attach. 1

at 97-98.)  Petitioner testified that on the way to the store, Mr. Chaney greeted someone he knew

(who was not Mr. Blanton), and then he and Mr. Chaney entered the store.[4]  (*Id*. at 98-100.)

Petitioner testified that when they walked out of the store, Petitioner asked Mr. Chaney who the

man was that he was talking to because Petitioner thought he looked familiar.  (*Id*. at 100-101.)

Petitioner testified that Mr. Chaney told Petitioner that the man's name is Blue, and Petitioner

walked back to talk to Blue because he thought Blue was a family friend.  (*Id*. at 101.)  Petitioner

testified that after a brief conversation, he and Blue exchanged handshakes and he and Mr.

Chaney left.  (*Id*.)

          Petitioner testified that as he and Mr. Chaney walked down the street, the police officers

stopped their patrol vehicle on the opposite side of the road but did not activate their lights or

sirens.  (*Id*. at 103, 108.)  Petitioner testified that Officer Kuhn—with his hand on his gun's

holster but with the gun still in the holster—told them to stop, Petitioner turned towards Officer

Kuhn, put his hands up, and asked what was going on.  (*Id*. at 103.)  Petitioner testified that

Officer Kuhn told him to put his hands on his head but that Petitioner had a bag in his hands

(from the purchase they had made at the Quail Street Market) so he asked if he could set the bag

on the ground.  (*Id*.)  Petitioner testified that the officer told him to put the bag down and asked

what was in the bag, to which Petitioner responded that the bag contained two beers.  (*Id*.)

Petitioner testified that this exchange occurred while Officer Kuhn was walking towards them

and that once Officer Kuhn reached them, he grabbed the front and back pockets of Petitioner's

---

[4]       Petitioner admitted to knowing Mr. Blanton but said he did not see Mr. Blanton on June
3, 2015.  (Dkt. No. 15 at 99-100.)

pants and coat pockets. (*Id*.) Petitioner testified that Officer Kuhn then squeezed the front and back pockets of Petitioner's pants and the outside pockets of his jacket. (*Id*. at 104.)

Petitioner testified that Officer Kuhn then asked him where he was coming from, where he was going, and for identification. (*Id*.) Petitioner testified that he provided his identification to Officer Kuhn, who took it and went back to his patrol vehicle, presumably to "run [Petitioner's] name." (*Id*.) Petitioner testified that Officer Kuhn returned approximately two to three minutes later, handed Petitioner his identification and told Petitioner to put his hands back on his head. (*Id*.) Petitioner testified that Officer Kuhn then grabbed his hat and started searching the interior of the hat, then put the hat on a vehicle and started to "frisk" or "search" Petitioner "from the neck down." (*Id*.)

Petitioner testified that when Officer Kuhn reached his waist, "he basically felt something and asked [Petitioner] what was that" and Petitioner did not answer. (*Id*.) Petitioner testified that Officer Kuhn asked again "what is that?" and that Petitioner again did not answer. (*Id*. at 103-04.) Petitioner testified that Officer Kuhn said into his radio "I got a guy here detained with a handgun," placed handcuffs on Petitioner, and asked Petitioner a third time "what is that?" (*Id*. at 104-105.) Petitioner said that he sarcastically responded with "it's a BB gun" and that Officer Kuhn said, "it better be a BB gun." (*Id*. at 105.) Petitioner testified that two other police vehicles arrived and that Officer Kuhn "eventually pull[ed the gun] from [his] briefs" and placed it on the vehicle inside Petitioner's hat. (*Id*.)

Petitioner testified that at some point in time he was taken to the police station, where he met with Detective Vogel, who read him his *Miranda* rights. (*Id*. at 110.) Petitioner testified that he understood those rights. (*Id*.)

### 3.    Trial Court's Suppression Hearing Decision

On January 19, 2016, the Petitioner's motions to suppress were denied and the court concluded that "the People have demonstrated by the requisite burden of proof that the approach of [Petitioner] and the process by which the gun was seized was in all respects proper, [and] that the statement taken from [Petitioner] was voluntarily made." (Dkt. No. 15, Attach. 1 at 119.)

### 4.    Acceptance of Second Guilty Plea Offer and Sentencing

On February 8, 2016, the District Attorney made Petitioner a new offer to plead guilty to attempted criminal possession of a weapon in the second degree, pursuant to New York Penal Law §§ 110.00 and 265.03(3), which would make Petitioner a second violent felony offender, Petitioner would waive all appeal rights except for the right to appeal the suppression hearing decision, with no commitment of a prison term, and a five-year post-release supervision period. (Dkt. No. 15, Attach. 1 at 122.)

During the plea colloquy on February 8, 2016, the state court judge asked Petitioner if he understood and found the terms of the plea offer acceptable, and Petitioner stated that he did. (*Id*. at 126-128). The court placed Petitioner under oath and confirmed that his ability to understand the proceedings was not impaired. (*Id*. at 122-124.) The court verified that Petitioner was entering the guilty plea "made of your own free will," because he was guilty. (*Id*. at 126.) The court also explained all of the rights that Petitioner was giving up by pleading guilty, confirmed that he understood that his guilty plea would have the same effect as a conviction following a jury trial, and that he was giving up all rights associated with a trial except the right to appeal the suppression hearing decision. (*Id*. at 124-126.) The court explained Petitioner's appeal rights and repeated that, as a condition of the plea agreement, he would be required to waive all of his rights to appeal the conviction and sentencing, which would preclude him from

seeking relief from a higher court with respect to his plea and sentencing except to appeal the suppression hearing. (*Id*. at 126-127.) Petitioner stated that he understood, and he discussed the appeal waiver with his counsel. (*Id*. at 127.) Petitioner signed a waiver of appeal form and the court—on the record—confirmed that it contained Petitioner's signature. (*Id*. at 128.) Petitioner pleaded guilty to the reduced charge of attempted criminal possession of a weapon in the second degree, and the court accepted his plea. (*Id*. at 129.)

On March 28, 2016, Petitioner was sentenced to six years in prison, five years of post-release supervision, and payment of fees. (*Id*. at 134.)

### 5. Appeals to New York State Courts

Petitioner appealed the trial court's decision regarding suppression to the New York State Supreme Court, Appellate Division, Third Department. (Dkt. No. 14, Attach. 1 at 1-18.) On December 7, 2017, the Third Department affirmed the lower court's decision. (*Jones*, 156 A.D.3d at 962; *see also* Dkt. No. 14, Attach. 1 at 225-227.)

The Appellate Division concluded that Officers Kuhn and Seeber had (1) an objective, credible reason to initially request basic information from Petitioner, and (2) a founded suspicion of criminal activity for the level two intrusion. (Dkt. No. 14, Attach. 1 at 226-27.)

On February 5, 2018, the New York State Court of Appeals denied leave to appeal. (Dkt. No. 14, Attach. 1 at 233); *People v. Jones*, 30 N.Y.3d 1116 (N.Y. 2018).

### B. Proceedings in This Court

On November 16, 2018, Petitioner commenced this proceeding by the filing of a verified Petition for writ of habeas corpus. (Dkt. No. 1.) On December 11, 2018, United States Magistrate Judge David E. Peebles issued a Decision and Order pursuant to Local Rules of

Procedure for Section 2254 cases and Section 2255 proceedings Rule 1.1(e)[5] directing, *inter alia*, Respondent to answer the Petition.  (*See generally* Dkt. No. 5.)  Only July 2, 2019, the case was re-assigned to the undersigned for further proceedings.  (Dkt. No. 11.)

On July 15, 2019, Respondent filed an answer to the petition, a memorandum of law supporting her response, and a compilation of the relevant state court records that were helpfully organized and indexed for the convenience of the Court and the parties.  (Dkt. Nos. 12, 13, 14, 15.)  On August 5, 2019, Petitioner filed a reply.  (Dkt. No. 18.)

This matter, which is now fully briefed, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See* Fed. R. Civ. P. 72(b).

### C.    Parties' Briefings

#### 1.    Respondent's Answer and Memorandum of Law

Generally, Respondent makes the following two arguments in support of her answer: (1) the trial court's credibility determinations made during the suppression hearing, are unreviewable, and (2) Petitioner's *Brady* and malicious prosecution claims are barred and without merit.  (*See generally* Dkt. No. 13 at 8-17 [Resp't's Mem. of Law].)

With respect to her first argument, Respondent argues that (1) whether the trial court gave improper weight to the witnesses' testimony at the suppression hearing is a state law claim, not a federal constitutional claim for which, habeas corpus relief is available, and (2) Petitioner's challenge to the suppression hearing decision is barred by *Stone v. Powell*, 428 U.S. 465 (1976), because (a) New York provided corrective procedures to redress Petitioner's Fourth Amendment

---

[5]    This was previously N.D.N.Y. L.R. 72.4(e).

allegations, and (b) there was not an unconscionable breakdown in the process given that he was granted a suppression hearing.  (*Id*. at 8-11.)

Second, Respondent argues that Petitioner's *Brady* and malicious prosecution claims are barred and without merit.  (*Id.* at 11-17.)  More specifically, Respondent argues that Plaintiffs claims are (1) barred by his guilty plea, which represented a break in the chain of events, (2) procedurally defaulted since he did not bring the claims to the state appellate courts, and (3) meritless because (a) pursuant to New York Criminal Procedure Law § 240.20, the prosecution was under no duty to produce the identity of the individual that police offers referred to as a known drug dealer, (b) the identity of the individual was not *Brady* material because it was not favorable to Petitioner, and (c) the proceedings did not terminate in Petitioner favor since he pleaded guilty and he does not allege or present any evidence that the prosecution initiated the proceeding out of malice.  (*Id*.)

### 2.    Petitioner's Reply

Generally, Petitioner makes the following two arguments in his reply: (1) the trial court's credibility determinations from the suppression hearing were unreasonable, and this Court may review that argument; (2) Petitioner's *Brady* and malicious prosecution claims are meritorious and not barred.  (*See generally* Dkt. No. 18 at 3-12 [Pet.'s Mem. of Law].)

First, Petitioner requests that the Court review the record and the consistency of his statements against the statements of the prosecution's witnesses who, he asserts, were "illogical, contradictory, and unsupported by the evidence."  (*Id*. at 3.)  Plaintiff argues that federal courts are permitted to review credibility findings and whether a state court judgment was reasonable.  (*Id*.)  Petitioner argues that the state court "ignored some evidence or interpreted some evidence incorrectly," its determination was "based on the belief and consideration of one witness over

another," and "[e]ven if this error were harmless, [Petitioner] would still be entitled to relief because the error was a 'per se prejudicial violation' that affected [his] substantial rights." (*Id*. at 4.)

Second, Petitioner argues that his *Brady* and malicious prosecution claims are meritorious and not barred. (*Id*. at 4-11.) More specifically, Petitioner argues that his guilty plea did not bar his claims because (a) his claims relate to the suppression hearing decision, which Petitioner reserved the right to appeal, (b) to the extent that Petitioner waived his right to appeal the issues presented here, it was an involuntary waiver since he was uninformed about the nature of the right to appeal or did not have a full understanding of the consequences of a waiver, (c) Supreme Court[10] precedent allows for appeal of a "pre-appeal constitutional ruling" even when a criminal defendant has pleaded guilty, and (d) "in New York, a guilty plea does not bar habeas review of constitutional claims arising from an illegal search provided the search was contested in state court." (*Id*. at 4-6.) In addition, Petitioner argues that his claims are not procedurally defaulted because (a) he raised the *Brady* violations to the trial court—when he made a request for discovery, that was denied by the prosecution—and to the Appellate Division, (b) failure to review the claims would be a "fundamental miscarriage of justice" since he is innocent and was in legal possession of the gun, acting as an agent of Albany's gun buyback program, and (c) if his claims are procedurally defaulted, it is due to the prosecution's denial of his discovery request and misrepresentation to the trial court that the discovery issue was not a *Brady* violation. (*Id*. at 6-8.) Moreover, Petitioner argues that there was an "unconscionable breakdown in the process" because the prosecution's denial of his discovery request led to the state court's

---

[10]    Petitioner cites *Irvis v. Haggat*, 12-CV-1538, 2015 WL 6737031, at *14 (N.D.N.Y. Nov. 3, 2015) (Scullin, J.) (*quoting Morissette v. United States*, 342 U.S. 246 (1952)).

inability to provide him with "an opportunity for full and fair litigation." (*Id.* at 8-9.) Finally, Petitioner argues that his *Brady* claim is meritorious because (a) he could have called as a witness the alleged "known drug dealer," to impeach the police officers' testimony, and (b) the *Brady* rule encompasses evidence known only to police investigators and not to the prosecutor and the people had a duty to disclose the name of the "known drug dealer" in advance of the suppression hearing. (*Id.* at 9-11.)

## III.   LEGAL STANDARDS

### A.   Standard Governing Review of a *Habeas Corpus* Petition

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996) a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the adjudication of the claim (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citing 28 U.S.C. § 2254(d)); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) (Sotomayor, J.).

The AEDPA "'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)); *accord, Cullen*, 563 U.S. at 181. Federal habeas courts must presume that the state court's factual findings are correct "unless applicants rebut this presumption with 'clear and convincing evidence.'" *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007) (quoting 28 U.S.C. §

2254(e)(1)); *see also Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro*, 550 U.S. at 473 (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

As required by section 2254, on federal habeas review, a court may only consider claims that have been adjudicated on the merits by the state courts. 28 U.S.C. § 2254(d); *Cullen*, 563 U.S. at 181; *Washington v. Schriver*, 255 F.3d 45, 52-55 (2d Cir. 2001). The Second Circuit has held that, when a state court adjudicates a claim on the merits, "a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001); *see Willson v. Sellars*, 138 S. Ct. 1188, 1192 (2018) (holding that a federal habeas court reviewing an unexplained state-court decision on the merits "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning," but that "the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision").

## B.    Legal Standard Governing Procedural Default

A federal judge may not issue a writ of habeas corpus if an adequate and independent state-law ground justifies the prisoner's detention, regardless of the federal claim. *See Wainwright v. Sykes*, 433 U.S. 72, 81-85 (1977). A federal habeas court generally will not consider a federal issue in a case if a state court decision "'rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Garvey v. Duncan*,

485 F.3d 709, 713 (2d Cir. 2007) (quoting *Lee v. Kemna*, 534 U.S. 362, 375 (2002)).  This rule applies whether the independent state law ground is substantive or procedural.  *Garvey*, 485 F.3d at 713.  When the independent and adequate state ground supporting a habeas petitioner's custody is a state procedural default, additional concerns come into play.  *Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *see also Whitley v. Ercole,* 642 F.3d 278, 286 (2d Cir. 2011) (quoting *Garcia v. Lewis*, 188 F.3d 71, 76 (2d Cir. 1999) ("[P]rocedural default in the state court will . . . bar federal habeas review when the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.") (internal quotation marks omitted)).

There are certain situations in which the state law ground will not be considered "adequate":  (1) where failure to consider a prisoner's claims will result in a "fundamental miscarriage of justice," *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); (2) where the state procedural rule was not "'firmly established and regularly followed,'" *Ford v. Georgia*, 498 U.S. 411, 423-424 (1991); *James v. Kentucky*, 466 U.S. 341, 348-349 (1984); and (3) where the prisoner had "cause" for not following the state procedural rule and was "prejudice[d]" by not having done so, *Wainwright*, 433 U.S. at 87.  In certain limited circumstances, even firmly established and regularly followed rules will not prevent federal habeas review if the application of that rule in a particular case would be considered "exorbitant."  *Garvey*, 485 F.3d at 713-714 (quoting *Lee*, 534 U.S. at 376).[13]

---

[13]    In determining whether the application of an independent state rule was "exorbitant," the court should consider (1) whether the alleged procedural violation was actually relied upon by the trial court and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state case law required compliance with the rule in the specific circumstances; and (3) whether petitioner had "substantially complied" with the rule given the "realities of trial," and whether demanding perfect compliance with the rule would serve a legitimate governmental interest.  *Garvey*, 485 F.3d at 714 (quoting *Cotto v. Herbert*, 331 F.3d

### C.    Legal Standard Governing Exhaustion of Remedies

Before seeking federal habeas relief, a petitioner must exhaust available state remedies or establish either an absence of available state remedies or that such remedies cannot adequately protect his rights. *Aparicio v. Artuz*, 269 F.3d 78, 89 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(b)(1)); *Ellman v. Davis*, 42 F.3d 144, 147 (2d Cir. 1994). The exhaustion doctrine recognizes "respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions." *Daye v. Attorney Gen. of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982); *see also Galdamez v. Keane*, 394 F.3d 68, 72 (2d Cir. 2005) ("Comity concerns lie at the core of the exhaustion requirement."). Although both federal and state courts are charged with securing a state criminal defendant's federal rights, the state courts must initially be given the opportunity to consider and correct any violations of federal law. *Galdamez*, 394 F.3d at 72 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999)). "The chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Daye*, 696 F.2d at 192 (footnote omitted).

This exhaustion requirement is satisfied if the federal claim has been "'fairly present[ed]'" to the state court. *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). A claim has been "fairly presented" if the state court was apprised of "both the factual and the legal premises of the claim [the petitioner] asserts in federal court." *Daye*, 696 F.2d at 191. Thus, "the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." *Id.* at 192.

---

217, 240 (2d Cir. 2003)). The *Cotto* factors are not determinative, but are a guide to evaluate the state's interest in a particular rule in the circumstances of a particular case. *Id.* at 714.

Significantly, "[t]he exhaustion doctrine 'requires only that a petitioner present his claim once on direct or collateral review.'"  *Salahuddin v. Strack*, 97-CV-5789, 1998 WL 812648, at *5 (E.D.N.Y. Aug. 12, 1998) (quoting *Sanford v. Senkowski*, 791 F. Supp. 66, 69 (E.D.N.Y. 1992)); *see Fielding v. LeFevre*, 548 F.2d 1102, 1106 (2d Cir. 1977) ("In order to meet the exhaustion requirement, a petitioner must have presented his claim to the state courts at least once, on direct or collateral review.").  "Therefore, even if a claim is not raised at trial or on direct appeal, a claim pursued throughout a full round of state post-conviction proceedings is exhausted."  *Salahuddin*, 1998 WL 812648, at *5 (citing, *inter alia, Castille v. Peoples*, 489 U.S. 346, 350-51 (1989)); *see also Harvey v. Portuondo*, 98-CV-7371, 2002 WL 2003210, at *5 (E.D.N.Y. Aug. 5, 2002).

### D.      Legal Standard Governing Guilty Pleas

The standard governing the acceptance of guilty pleas is neither recently evolved nor controversial.  "The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'"  *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970) (citations omitted)); *see also Parke v. Raley*, 506 U.S. 20, 28-29 (1992) (plea is valid when it is both knowingly and voluntarily made); *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969) (United States Constitution requires that guilty plea be intelligently and voluntarily entered.  A knowing plea is entered "'with understanding of the nature of the charge and the consequences of the plea.'" *Santobello v. New York*, 404 U.S. 257, 261 n.1 (1971) (quoting Fed. R. Crim. P. 11); *see Martinez v. Costello*, 03-CV-2763, 2004 WL 26306, at *5 (S.D.N.Y. Jan. 5, 2004) (citing *Santobello* and Fed. R. Crim. P. 11); *see also Hanson v. Phillips*, 442 F.3d 789, 798 (2d Cir. 2006).

Applying this standard, to establish that a criminal defendant's guilty plea was knowingly, intelligently, and voluntarily entered the court must find, based upon the record of the relevant plea proceedings, that he or she (1) was competent to proceed and was fully aware of the nature of the charges faced; (2) had a rational and factual understanding of the proceedings; and (3) was cognizant of the constitutional protections relinquished upon entry of the plea. *Oyague v. Artuz*, 393 F.3d 99, 106 (2d Cir. 2004); *Matusiak v. Kelly*, 786 F.2d 536, 543 (2d Cir.), *cert. dismissed*, 479 U.S. 805 (1986). While "the question of whether a plea of guilty has been entered voluntarily within the meaning of the Constitution is often a complex one that involves mixed questions of law and fact[,]" the ultimate issue of whether a plea represents an effective waiver of federal Constitutional rights is controlled by federal law. *Oyague*, 393 F.3d at 104.

## IV.    ANALYSIS

For the reasons stated in Respondent's memorandum of law, I find that the trial court's credibility determinations based on the suppression hearing are unreviewable, and Petitioner's *Brady* and malicious prosecution claims are barred and without merit. (Dkt. No. 13 at 8-17.) As a result, I recommend that the petition be dismissed and denied.

### A.    Whether Petitioner's Argument That the Suppression Hearing Court's Credibility Determinations Were Unreasonable, Is Unreviewable

After carefully considering the matter, I answer this question in the affirmative for the two reasons set forth in Respondent's memorandum of law. (Dkt. No. 13 at 9-11.)

First, Petitioner's argument that the trial court gave improper weight to the testimony of the People's witnesses is "purely a matter of state law, [and] it is not cognizable on habeas review." *McClelland v. Kirkpatrick*, 778 F. Supp. 2d 316, 335 (W.D.N.Y. 2011) (citing 28 U.S.C. § 2254; *Estelle v. McGuire*, 502 U.S. 62, 68 (1992)); *accord Huff v. Miller*, 17-CV-0364,

2020 WL 2333762, at *5 (W.D.N.Y. Mar. 20, 2020).  "Federal courts routinely dismiss claims

attacking a [decision] as against the weight of the evidence on the basis that they are not federal

constitutional issues cognizable in a habeas proceeding."  *McClelland*, 778 F. Supp. 2d at 335

(citing *Ex parte Craig*, 282 F. 138, 148 (2d Cir. 1922) (holding that "a writ of habeas corpus

cannot be used to review the weight of the evidence"), *aff'd*, 263 U.S. 255 (1923); *Garrett v.

Perlman*, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) (same); *Douglas v. Portuondo*, 232 F. Supp.

2d 106, 116 (S.D.N.Y. 2002) (same)).

Second, this argument is barred by the doctrine set forth by the Supreme Court in *Stone v.

Powell*, which states that "where the State has provided an opportunity for full and fair litigation

of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted

federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or

seizure was introduced at his trial."  *Stone v. Powell*, 428 U.S. 465, 482 (1976).  "Therefore,

habeas review is only available: '(a) if the state has provided no corrective procedures at all to

redress the alleged Fourth Amendment violations; or (b) if the state has provided a corrective

mechanism, but the defendant was precluded from using that mechanism because of an

unconscionable breakdown in the underlying process.'"  *James v. Superintendent*, 18-CV-0864,

2021 WL 4482756, at *2 (N.D.N.Y. Sept. 13, 2021) (Hummel, M.J.) (quoting *Capellan v. Riley*,

975 F.2d 67, 70 (2d Cir. 1992)).  "The Second Circuit has recognized that New York provides

adequate procedures to redress Fourth Amendment violations."  *James*, 2021 WL 4482756, at *3

(citing *Capellan*, 975 F.2d at 70 & n.1; *Blake v. Maruscello*, 10-CV-2570, 2013 WL 3456958, at

*5 (E.D.N.Y. July 8, 2013)).  "Here, [P]etitioner availed himself of a suppression hearing and

was upset with its result, as well as the outcome of his subsequent appeal.  However,

disagreement with the state court outcome is insufficient to warrant habeas review." *Id*. (citing *Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir. 1997)).

As a result, I recommend that Petitioner's claim that the trial court's credibility determinations were unreasonable, be dismissed as unreviewable.

### B.    Whether Petitioner's *Brady* Violation and Malicious Prosecution Claims Are Barred and Without Merit

After carefully considering the matter, I answer this question in the affirmative for the three reasons set forth in Respondent's memorandum of law.  (Dkt. No. 13 at 11-17.)

First, Petitioner's malicious prosecution claims are barred by his guilty plea,[16] which "represent[ed] a break in the chain of events which ha[d] preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973); *see Byng v. Annucci*, 18-CV-0994, 2021 WL 1565189, at *8 (N.D.N.Y. Apr. 21, 2021) (Singleton, J.) (holding that the petitioner's prosecutorial misconduct claim was barred by *Tollett* because it related to events that occurred before the petitioner's guilty plea); *Woods v. Superintendent*, 19-CV-0505, 2020 WL 3642311, at *11-12 (N.D.N.Y. July 6, 2020) (Sharpe, J.) (quoting *Williams v. Gonyea*, 16-CV-0460, 2017 WL 4990645, at *5 (N.D.N.Y. Oct. 31, 2017)) ("Therefore, '[b]ecause the events which give rise to this claim [of prosecutorial misconduct] occurred prior to [petitioner's] guilty plea, the claim is foreclosed by the *Tollett* bar.'").

---

[16]    However, the Court acknowledges that there is some authority that a guilty plea does not preclude a *Brady* claim in a federal habeas case.  *Karlsen v. Kilpatrick*, 378 F. Supp. 3d 237, 249 (W.D.N.Y. 2019) (citing *Hill v. West*, 599 F. Supp. 2d 371, 388 n.3 (W.D.N.Y. 2009)).

Second, in the alternative, Petitioner's malicious prosecution and *Brady* violation claims are procedurally defaulted because he failed to present them to the state courts. In addition, Petitioner does not make the requisite showing for this Court to consider procedurally defaulted claims.

Third, in the alternative, Petitioner's prosecutorial misconduct and *Brady* violation claims are without merit. With respect to Petitioner's *Brady* violation claim,[17] the prosecution must disclose "evidence that is both favorable to the accused and 'material either to guilt or to punishment.'" *United States v. Bagley*, 473 U.S. 667, 667 (1985) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). To establish a *Brady* violation, a petitioner "must show that: (1) the government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *United States v. Kirk Tang Yuk*, 885 F.3d 57, 86 (2d Cir. 2018) (quoting *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001)) (internal quotation marks omitted). In the context of a guilty plea, favorable evidence is material if there is a "reasonable probability that but for the failure to produce such information the defendant would not have entered the plea but would instead have insisted on going to trial." *United States v. Avellino*, 136 F.3d 249, 256 (2d Cir. 1998) (quoting *Tate v. Wood*, 963 F.2d 20, 24 (2d Cir. 1992)); *Hayes v. Lee*, 11-CV-1365, 2015 WL 5943677, at *31 (S.D.N.Y. Oct. 13, 2015) (internal quotation marks omitted) (quoting, *inter alia, United States v. Danzi*, 726 F. Supp. 2d 120, 131 (2d Cir. 2010)). For the reasons set forth in

---

[17]    "Whether *Brady* and its progeny require disclosures in advance of pre-trial hearings is an open question in this circuit." *United States v. Nelson*, 193 F. App'x 47, 50 (2d Cir. 2006); *see United States v. White*, 489 F. Supp. 3d 274, 280 (S.D.N.Y. 2020) (citations omitted) ("The Second Circuit has not yet ruled on whether *Brady* applies in the context of a motion to suppress or the like. Three courts in this district have assumed *arguendo* that it does, though only to conclude that the Government did not violate any potential *Brady* requirements.").

Respondent's memorandum of law, the name of the individual—who police officers described as a known drug dealer—was not favorable to Petitioner for purposes of *Brady*. (Dkt. No. 13 at 15-16.) In addition, Petitioner has failed to show prejudice because he failed to show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the [suppression hearing] would have been different." *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005); *see United States v. Agurs*, 427 U.S. 97, 109-110 (1976) (The "mere possibility that an item of undisclosed information might have helped the defense or might have affected the outcome of the trial, does not establish materiality in the constitutional sense."). With respect to Petitioner's prosecutorial misconduct claim,[18] federal habeas review is limited to the narrow issue of whether the alleged misconduct violated due process. *Darden v. Wainright*, 477 U.S. 168, 181 (1986). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *Bagley*, 473 U.S. 667). "Under this standard, a petitioner must show there is a reasonable probability the error complained of affected the outcome of the trial—i.e., that absent the alleged impropriety, the verdict probably would have been different." *Griffin v. Coveny*, 19-CV-1495, 2021 WL 3884217, at *12 (N.D.N.Y. Aug. 31, 2021) (Singleton, J.). As set forth above, Petitioner fails to establish that there is a reasonable probability that the outcome of the suppression hearing—and thus, his guilty plea—would have been different if he had known in advance of the suppression hearing, the identity of the individual police officers referred to as a known drug dealer.

For each of these reasons, I recommend that the Petition be dismissed and denied.

---

[18]     To the extent that Plaintiff attempts to assert a claim of malicious prosecution seeking damages, the proper avenue is pursuant to 42 U.S.C. § 1983.

## V.    CERTIFICATE OF APPEALABILITY

To appeal a final order denying a request by a state prisoner for habeas relief, a petitioner must obtain from the court a certificate of appealability ("COA").  28 U.S.C. § 2253(c)(1)(A); *see also* Fed. R. App. P. 22(b)(1) ("[T]he applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c).").  In the absence of a COA, a federal court of appeals lacks jurisdiction to entertain an appeal from the denial of a habeas petition.  *Hoffler v. Bezio*, 726 F.3d 144, 152 (2d Cir. 2013).  A COA may issue only "if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *Hoffler*, 726 F.3d at 154.  A petitioner may demonstrate a "substantial showing" if "the issues are debatable among jurists of reason; . . . a court could resolve the issues in a different manner; or . . . the questions are adequate to deserve encouragement to proceed further."[19]  *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (quotation marks omitted).

In this instance, I find that jurists of reason would not find it debatable as to whether the petition in this matter is meritorious.  Accordingly, I recommend against the issuance of a COA.

**ACCORDINGLY**, it is

**RECOMMENDED** that the petition be **DENIED and DISMISSED**, and that a certificate of appealability not be issued to Petitioner; and it is further

---

[19]    A similar standard applies when a COA is sought to challenge the denial of a habeas petition on a procedural basis. *See Slack v. McDaniel*, 529 U.S. 473, 478 (2000) ("[A] COA should issue . . . if the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.").

**ORDERED** that the Clerk of the Court shall file a copy of this Report-Recommendation on the parties, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[20]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated: November  8 , 2021
       Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

[20]     If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).